IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

TOLEDO MACK SALES & SERVICE, INC.,
et al.,

         Plaintiff,      Case No. 3:09 CV 2269

  -vs-

                    <u>MEMORANDUM OPINION</u>

MACK TRUCKS, INC.,

         Defendant.

KATZ, J.

   This matter is presently before the Court on the motion (Doc. 9) of defendant Mack Trucks, Inc. ("Mack"), to dismiss the Complaint (Doc. 1) in this action pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  The Court finds the motion well-taken and the same is granted.

**I. Background**

   This suit arises from the breakdown of the long-standing distributorship arrangement between Mack and plaintiff Toledo Mack Sales & Services, Inc. ("TMSS"), a relationship which began in 1982.  The "Distributor Agreement" governing their relationship is attached as an exhibit to the Complaint (See Doc. 1, Exh. A ["Distributor Agreement"]), and thus this Court may properly consider it at this stage of the proceedings. See 2 J. Moore et al., Moore's Federal Practice § 12.34[2], p. 12-87 (3d ed. 2009).

   In 2002, TMSS filed a federal antitrust action against Mack in the United States District Court for the Eastern District of Pennsylvania.  Mack counterclaimed for misappropriation of trade secrets, and, after a jury trial, judgment was ultimately entered in that action in favor of Mack and against TMSS in the amount of $1.6 million.

On the basis of evidence discovered during the federal action, Mack became convinced that TMSS had illicitly funneled trade secrets to a competitor, PAI, and it issued TMSS a notice of termination on March 27, 2003. On June 25, 2003, TMSS filed a protest of this action with the Ohio Motor Vehicle Dealers Board (OMVDB). A hearing officer of the OMVDB found that Mack did not have "good cause" to terminate its relationship with TMSS, and this ruling was affirmed on appeal to the Franklin County (Ohio) Court of Common Pleas. But the Tenth District Court of Appeals reversed, finding that the record evidence indicated that Mack had good cause to terminate TMSS's distributorship based on its sharing of trade secrets with a competitor of Mack, PAI.

After appellate briefs had been filed in the Tenth District, TMSS discovered new evidence indicating that PAI was not in fact, a competitor of Mack. TMSS quickly moved for sanctions against Mack before the OMVDB, but the motion was not acted upon. TMSS also moved, in the Tenth District, for reconsideration of its decision upholding the termination, and for the Tenth District to issue a special mandate to the OMVDB to supplement the record. The Tenth District, however, denied the motions, concluding that it was bound by the original record and that no procedure existed for issuing a special mandate. (See Doc. 9, Exh. 5). When the matter was remanded to the Common Pleas Court for entry of judgment, TMSS filed a motion for relief from the judgment, with detailed allegations of Mack's deception. The Common Pleas Court denied the motion. (See Doc. 9, Exh. 7). The Ohio Supreme Court declined review, and the Tenth District's decision thus became final. On December 13, 2006, Mack terminated TMMS's franchise.

The Distributor Agreement mandates that Mack repurchase TMMS's inventory of parts and vehicles if Mack terminated the agreement. See Distributor Agreement at ¶ 28. Mack

2

therefore proceeded to do so. Mack paid cash for the vehicles, but decided to offset the price of the parts against the $1.6 million judgment TMSS owed to Mack. See Complaint at 47. Mack had not yet executed the judgment against TMSS at the time of the parts repurchase. *Id*.

TMSS's inventory of parts had been pledged as collateral against a loan to TMSS from Fifth Third Bank. As a result of the Mack's decision not pay cash for the parts, TMSS was forced to default on its loan. Fifth Third therefore liquidated more that $1 million in personal assets pledged by plaintiffs David and Sally Yeager as collateral for the loan. TMSS and the Yeagers filed this action in response.

**II. Standard of Review**

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Courts must accept as true all of the factual allegations contained in the complaint when ruling on a motion to dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). To survive dismissal, a complaint must contain enough factual material to state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Nor is it enough for the complaint to state facts that are "merely consistent with a defendant's liability." *Iqbal*, 129 S.Ct. at 1949. Rather, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, *Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

The term "plausible," as used in *Twombly* and *Iqbal*, is to be understood in a peculiarly narrow sense, and does not refer to the likelihood that the plaintiff will be able to prove a

3

particular allegation. See *Iqbal*, 129 S.Ct. at 1951 ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical."); *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."). Rather, the Court meant the term to refer to the plausibility of the plaintiff's legal theories, when considered in light of the factual allegations in the complaint.

**III. Discussion**

The Complaint contains four counts: for conversion, breach of contract, abuse of process, and violation of Ohio Rev. Code § 4517.59. The claims will be considered in turn.

*I. Conversion*

The basis for the conversion count, as stated in the Complaint, is that Mack wrongfully refused to pay immediately in cash for the parts it was obligated to repurchase under the Distributor Agreement. The Complaint alleges that TMSS had an "immediate right to possession of the money [Mack] owed in connection with the repurchase of [TMSS's] assets", but that Mack "wrongfully interfered" with that right. See Doc. 1 ["Complaint"] at ¶¶ 40, 41.

It is well-settled that, "[g]enerally, the existence of a contract action excludes the opportunity to present the same case as a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151 (1996) (internal quotation marks and formatting omitted). Rather, under Ohio law, "a tort exists only if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed." *Wolfe v. Continental Casualty Co.*, 647 F.2d 705, 710 (6th Cir. 1981).

In this case, it is clear from the Complaint and the Distributor Agreement attached thereto that Mack's obligation to purchase TMSS's parts inventory arose from the Distributor Agreement,

not some more general duty in tort. See Complaint at ¶ 39 (identifying the converted goods as "inventory that [Defendant] was obligated to repurchase pursuant to the Distributor Agreement"). Indeed, essentially the same facts are alleged in Count Two of the Complaint to state a claim for breach of contract. See Complaint at ¶ 52 ("[Defendant] has breached the Distributor Agreement by . . . refusing to pay for [TMMS's] inventory of new and reasonably salable parts").

It is true that the general obligation not to convert the goods of another does not arise from contract. But this argument proves too much, for otherwise nearly any breach of contract claim alleging a failure to pay for goods could be brought as a conversion claim as well. By way of counterfactual, imagine that the Distributor Agreement had provided for Mack to repurchase TMMS's parts inventory, but with TMSS only receiving payment if and when Mack sold the goods to a third party. In that case, clearly no conversion claim would lie if TMSS was not paid immediately by Mack. But that is only because the terms of the hypothetical contract created no right to immediate payment, not any tort law principle. TMSS's claimed right of immediate payment in cash for the goods therefore is not "independent of the contract", but rather derived from it.

Because the conversion claim and the breach of contract claim in this case both arise out of Mack's contractual obligation to purchase TMSS's parts inventory, the conversion claim must be dismissed.

## *II. Breach of Contract*

TMSS next claims that Mack breached the Distributor Agreement by failing to pay for its parts inventory in cash. The Complaint alleges that "at all times [Mack] wrongfully intended to 'credit' the money owed to [TMSS] against the judgment [Mack] obtained in the [federal antitrust

5

action]." See Complaint at ¶ 47. Mack contends that its decision to credit its roughly $800,000 debt for the purchase of the parts inventory against the $1.6 million judgment it obtained against TMSS was authorized by the terms of the Distributor Agreement.

Under Ohio law, the construction of a written contract is a question of law. *Mercer v. 3M Precision Optics, Inc.*, 181 Ohio App.3d 307, 908 N.E.2d 1016, 1018 (2009). In construing a contract, the intent of the parties is controlling and is presumed to lie within the language used in the written instrument. *Id*. When a contract is clear and unambiguous, a court need not interpret the language and must enforce the agreement by attributing the plain and ordinary meaning to the language as written. *Id*.

The Distributor Agreement at points provides specifically for payment in cash. See Distributor Agreement at ¶ 9 ("[T]itle to all Mack Products furnished under this Agreement remains in [Mack], with right of repossession for default, until such goods are paid for in cash"). The Agreement also contains a provision barring TMSS from "deducting from any payment to [Mack] the amount of any credits for returned material or parts, warranty claim, invoice transfers to other Distributors or Branches, [Mack] invoicing discrepancies, or otherwise without [Mack's] prior written approval." Distributor Agreement at ¶ 20. The Agreement contains no parallel provisions, however, requiring Mack to pay for goods purchased from TMSS in cash or barring Mack from deducting monies owed from payments to TMSS. Moreover, the provision requiring Mack to repurchase TMSS's parts inventory after termination does not specifically require Mack

to pay for the parts in cash or bar Mack from setting off the value of the parts against other debts.[1] See Distributor Agreement at ¶ 28.

The fact that specific provisions in the Distributor Agreement require TMSS to pay Mack in cash and prohibit TMSS from applying offsets against Mack gives rise to an inference that payment in cash is otherwise not required, and that credit offsets are otherwise permissible. Under the principle of *expressio unius est exclusio alterius*, the listing of certain items implies the exclusion of those not listed. "Typically, *expressio unius est exclusio alterius* is applied when there is a listing of items in an associated group or series, which '[justifies] the inference that items not mentioned were excluded by deliberate choice, not inadvertence.'" *Mercer*, 908 N.E.2d at 1018 (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)). The fact that no provision of the Agreement requires Mack to pay TMSS in cash or bars Mack from applying credit offsets against TMSS, when other provisions clearly bar TMSS from doing the same to Mack, justifies the inference that the omission of such language was deliberate.

Although the above-noted lack of reciprocity in these provisions might be taken to imply nothing more than a want of mutuality in favor of the franchisor, the discrepancy might also be seen as reflecting an important purpose of the contract. The provisions requiring the distributor to pay in cash and barring the distributor from applying offsets are consistent with a general concern reflected throughout the Distributor Agreement with ensuring the creditworthiness of the distributor and protecting the franchisor from having to bear the risk of a distributor's insolvency.

---

[1] It might be noted in this connection that Mack's termination of TMSS and the $1.6 judgment it obtained in the federal action in the Eastern District of Pennsylvania both arose from the same occurrence: TMSS's alleged provision of trade secrets to PAI.

7

For example, the Agreement requires the distributor (but not Mack) to submit "quarterly balance sheets and operating statements on the Mack Standard Accounting System forms, or other forms prescribed by [Mack], which shall be complete and shall fully reflect the true financial condition and operating results of the Distributor's business at the end of the period covered by such reports." Distributor Agreement at ¶ 21. The Agreement also contains a provision stating that "termination of this agreement shall in no event operate as a cancellation of any indebtedness between the parties hereto." *Id*. at ¶ 26. Finally, the Agreement allows for Mack to immediately terminate a distributor who defaults "in the payment of any obligation owing to [Mack]"; who becomes insolvent; or who submits to Mack "knowingly false financial reports, statements, or claims." *Id*. at ¶ 25.

This concern with the distributor's solvency is certainly implicated by cases like the one at present, where the terminated distributor is unable to pay a large court judgment owed to the franchisor. Indeed, solvency concerns can be expected to be at their peak in cases where a distributor is terminated by the franchisor, the situation contemplated by the repurchase provision at issue in this case. See Distributor Agreement at ¶ 28. The contractual provisions at issue here appear to further Mack's interest in protecting itself against the risk of a distributor's insolvency. By requiring a distributor to pay in cash before the transfer of title, the contract mitigates the risk that an insolvent distributor might take advantage of the Distributor Agreement to obtain goods from Mack on credit. And allowing Mack to offset debts in its payments to a distributor may well be the only way to collect a debt owed by a distributor who has become insolvent.

The Distributor Agreement nowhere specifies that Mack must pay cash in its repurchase of a terminated distributor parts inventory, or that Mack may not offset unsatisfied debts from the

8

payment, and the Court finds that the Agreement was not intended to contain such terms. The Complaint itself alleges that Mack intended to credit the court judgment against the price of TMSS's parts inventory, see Complaint at ¶ 47, and thus Mack satisfied its obligations under the Distributor Agreement to repurchase the parts inventory at the price specified in the contract. Therefore, the Court finds that the Complaint fails to state a claim for breach of contract.

### *III. Abuse of Process*

The third claim in the Complaint is for abuse of process. This claim arises out of Mack's concealment of its business relationship with PAI throughout the proceedings in the Ohio courts determining whether Mack had "good cause" to terminate TMSS. The Complaint alleges that Mack abused this process by making "arguments before the Tenth District that were false and that played a material role in the Court's decision." Complaint at ¶ 56.

The elements of the tort of abuse of process are: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaffer, and Rowe Co.*, 68 Ohio St.3d 294, 298 (1994). This tort applies to "cases in which legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but nevertheless has been perverted to accomplish an ulterior purpose for which it was not designed." *Id*. at 297 (quoting Prosser & Keeton, The Law of Torts (5 Ed.1984) 897, § 121). But the tort does not apply to cases "where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id*. at 298 n. 2 (quoting Prosser & Keeton, *supra*, at 898).

9

Therefore, it is not enough to merely allege that the defendant acted "in bad faith and with malicious intent" throughout the proceedings. Rather, in an abuse of process case, "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 271 (1996) (quoting Prosser & Keeton, *supra*, at 898). The *Robb* Court clarified that "abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order", or where the legal proceeding is initiated with "an ulterior motive" to achieve a purpose apart from a favorable judgment. *Robb*, 75 Ohio St.3d at 271.

It is clear that Count Three of the Complaint is deficient when measured by this standard. The "ulterior purpose" alleged to have been pursued by Mack was nothing more than the termination of TMSS's distributorship. See Complaint at ¶ 57 (Alleging that Mack sought "to destroy [TMSS's] business"). Far from being an "ulterior purpose for which [the proceedings] were not designed," *Yaklevich* at 298, Mack's termination of TMSS's distributorship was the very matter at issue before these courts. See *Id*. at ¶ 55 (TMSS commenced the proceeding "to contest [Mack's] attempt to terminate [its] franchise rights."). Indeed, the Complaint points to "the [Tenth District]'s decision" as the intended outcome of Mack's abuse of the legal process. *Id*. at ¶ 56. Because, according to the Complaint itself, the end Mack sought to achieve by its abuse of the legal process was nothing more than a judgment in its favor on a matter properly at issue in the proceedings, the Complaint fails to state a claim for abuse of process.[2]

---

[2]

The allegations of abuse in the Complaint are indeed deeply troubling, and the preceding discussion is not meant to suggest otherwise. This Court is strongly of the opinion that "parties [to litigation] have an obligation to be honest and forthright in their dealings with each other and with

*IV. Violation of Ohio Rev. Code § 4517.59*

TMSS's fourth and final claim for relief is for violation of Ohio Rev. Code §§ 4517.59 (A) and (J). This count also arises from Mack's decision not to pay cash in its parts inventory repurchase. The Complaint alleges that Mack violated § 4517.59(A) by failing to act in good faith while acting or purporting to act under the terms of the Distributor Agreement. Complaint at § 60. As the basis for the § 4517.59(J) claim, the Complaint contends that "[Mack] failed to pay [TMSS] within thirty days after purportedly repurchasing parts from [TMSS]." *Id*.

**1. § 4517.59(A)**

Because this Court has already found that Mack was acting within the terms of the Distributor Agreement in offsetting the price of the parts inventory against the amount owed by TMSS on the judgment, TMSS has not stated a proper claim for violation of § 4517.59(A). The Sixth Circuit has held, in considering the duty of good faith contained in § 4517.59(A), that "[u]nder Ohio law, [plaintiff] cannot complain that [defendant] violated the duty of good faith simply because [defendant] exercised its clearly expressed contractual rights." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 207 (6th Cir.1995).

---

the Court." *G.G. Marck v. Peng*, 2009 WL 3489871 at *7 (N.D. Ohio Oct. 21, 2009). But the tort of abuse of process is simply not intended to provide a vehicle for reconsideration of another court's decision on the merits. In this case, the Franklin County Common Pleas Court carefully reviewed the new evidence presented by TMSS in its motion for relief from the judgment and, although the Court found the evidence "troubling", it also stated that "it does not find the allegations to rise to a level such that this Court has authority to reopen the administrative appeal to consider the new evidence." (Doc. 9, Exh. 7). To the extent that TMSS's abuse of process claim invites this Court to overturn that decision, it seeks to involve this Court in a matter that is best dealt with through the procedures for post-judgment relief available in the Ohio court system. At some point, a suit must reach an endpoint, and the parties must attempt to move on with their lives.

11

Factually, the Complaint alleges nothing more in connection with the § 4517.59 claim than that Mack invoked paragraph 28 of the Distributor Agreement and informed TMSS that it was repurchasing its parts inventory. See Complaint at ¶¶ 44-47. Although TMSS claims that Mack "misled" it into surrendering its parts inventory, this argument is predicated entirely on the notion that Mack had a contractual obligation to pay cash for the parts, a claim that this Court has already rejected. Therefore, this Court finds that Mack's actions in repurchasing the parts inventory were taken in good faith, and that its actions were commercially justifiable in light of the large debt TMSS owed to it and the uncertain prospect of Mack ever being able to otherwise recoup the amount of said judgment.

**2. § 4517.59(J)**

Ohio Rev. Code § 4517.59(J) provides that: "Notwithstanding the terms, provisions, or conditions of any agreement, franchise, or waiver, no franchisor shall: . . . [f]ail to pay a franchisee within thirty days after approval by the franchisor of any claim by a franchisee for labor and parts made under 4517.52 and 4517.53 of the Revised Code." Of these two provisions, only § 4517.52 is argued to be applicable here; that section relates to a franchisee's reimbursement for warranty work on vehicles.

There is passing mention in the Complaint of Mack's acknowledgment that part of the money it owed to TMSS was for "warranty credits". See Complaint at 28. But the "warranty credits" are not mentioned anywhere else, and it is not clear from the Complaint what transactions or occurrences this debt arose from, whether the debt is one covered by § 4517.59(J) or § 4517.52, or even what a "warranty credit" is. By contrast, the Complaint repeatedly invokes Mack's parts inventory purchase as the basis for the claims therein, including in connection with its §

12

4517.59(J) claim. See Complaint at § 60 ("[Mack] has violated Ohio Rev. Code Chapter 4517[(J)] by . . . failing to pay [TMSS] within thirty days after purportedly repurchasing parts from Plaintiff").

To the extent this portion of the Complaint relies on the parts repurchase, it fails to allege a violation of § 4517.59(J), as the parts repurchase did not relate to TMSS's warranty work on vehicles. To the extent this claim is based on unspecified other transactions besides the parts inventory repurchase, it fails to meet the minimal burden of providing Mack with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

Both of TMSS's claims for violation of § 4517.59 must therefore dismissed.

**IV. Conclusion**

For the foregoing reasons, the motion to dismiss (Doc. 9) is granted, and the case is closed.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE